CASE NO. 05CV1274(RCL)
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
# ATTACHMENT NO. 4



UNITED STATES DISTRICT COURT CALIFORNIA
FOR THE DISTRICT OF COLUMBIA

JONATHAN W. RUDE,
    Plaintiff,
  vs.      Case No. 1:05cv1274RCL
DANCING CRAB AT WASHINGTON
HARBOUR, et al.,

    Defendants.
            /

DEPOSITION OF JAMES SYLVESTER

Taken at Carlsbad, California

December 11, 2006

Kelly Anastay, CSR - Certificate No. 10481

Page 2

```
 1              I N D E X
 2
 3  DEPOSITION OF JAMES SYLVESTER
 4  December 11, 2006
 5
 6  EXAMINATION                         PAGE
 7  BY MR. RUDE                         4, 63
 8  BY MR. TAPP                         25
 9  BY MR. LOEB                         34
10
11
12
13          INDEX OF EXHIBITS
14  FOR PLAINTIFF:
15  1   Amended Notice to Take Telephone Deposition;   9
        1 page
16
    2   Complainant/Witness Statement; 3 pages       10
17
    3   Oceanside Management Corporation Employee    11
18      Manual General Information; 7 pages
19
20
21
22
23
24  Witness signature page                66
25  Certificate page                      67
```

Page 2

      On Monday, December 11, 2006, commencing at the hour of 11:45 a.m., at 5963 La Place Court, Suite 306, in the City of Carlsbad, County of San Diego, State of California, before me, Kelly Anastay, Certified Shorthand Reporter in and for the State of California, personally appeared:
          JAMES SYLVESTER,
called as a witness by the Plaintiff, who, being by me first duly sworn, was thereupon examined as a witness in said cause.
        A P P E A R A N C E S
    (ALL COUNSEL APPEARING TELEPHONICALLY)

For Plaintiff:

    LAW OFFICES OF RICK RUDE
    BY: RICK RUDE, ESQ.
    207 Park Avenue, Suite 103
    Falls Church, Virginia 22046
    (703) 536-3063

For Defendant Olayinka Adeboyeku:

    LAW OFFICES OF FRIED FRANK
    BY: DANIEL E. LOEB, ESQ.
        KERRY HOTOPP, ESQ.
    1001 Pennsylvania Avenue, N.W., Suite 800
    Washington, D.C. 20004
    (202) 639-7062
For Co-Defendant Anthony Wood:
    LAW OFFICES OF BARRY TAPP
    BY: BARRY TAPP, ESQ.
    14662 Cambridge Circle
    Laurel, Maryland 20707
    (301) 725-6030

Page 3

```
 1      CARLSBAD, CALIFORNIA; DECEMBER 11, 2006; 11:45 A.M.
 2              JAMES SYLVESTER,
 3      having been sworn, testified as follows:
 4
 5              EXAMINATION
 6  BY MR. RUDE:
 7      Q. Good afternoon, Mr. Sylvester.
 8      I'm going to ask that, myself included here, we
 9  identify ourselves on the record so that you know who
10  you're speaking with. My name is Rick Rude, R-u-d-e. I'm
11  appearing here on behalf of plaintiff, Jonathan Rude.
12      MR. LOEB: Daniel Loeb, L-o-e-b, with Fried
13  Frank, together with Mr. Hotopp, who's here with me. I
14  represent one of the defendants, Olayinka Adeboyeku.
15      MR. TAPP: Barry Tapp, T-a-p-p. I represent
16  Anthony Wood in this case.
17  BY MR. RUDE:
18      Q. Are you ready, Mr. Sylvester?
19      A. Yes.
20      Q. Mr. Sylvester, would you please state your full
21  name for the record, please --
22      MR. LOEB: Mr. Rude, can I make a couple
23  requests on the record before we get started?
24      MR. RUDE: Sure.
25      MR. LOEB: Again, as I mentioned, Mr. Sylvester,
```

Page 4

## Page 9

1  when I believe I first started working there that summer.
2  And he was working there at the same time.
3      Q.  Did you work together in June of 2004?
4      A.  Yes, we did.
5      Q.  Do you know an individual named Anthony Wood?
6      A.  Yes, I do.
7      Q.  Where do you know Mr. Wood from?
8      A.  Mr. Wood was also a bouncer at Tony & Joe's.
9      Q.  When did you work with Mr. Wood?
10     A.  The previous summer, as well as the summer of
11 2004.
12     Q.  I'm going to take you to June 26 and 27 of 2004,
13 Mr. Sylvester. June 26th was a Saturday, the 27th was a
14 Sunday, the last weekend in the month of June. Do you
15 recall that weekend?
16     A.  Yes, I do.
17     Q.  I'm going to ask you if you worked that weekend.
18     A.  Yes. I did.
19         MR. RUDE: I'm going to backtrack here a bit. I
20 want to mark, as Exhibit No. 1, the amended deposition
21 notice for Mr. Sylvester, which identifies the purpose of
22 this deposition.
23         (Plaintiff's Exhibit No. 1 was marked.)
24         MR. RUDE: I'm going to ask that you be provided
25 with what's been identified as plaintiff's Exhibit No. 2.

## Page 10

1  It's a three-page document.
2         (Plaintiff's Exhibit No. 2 was marked.)
3  BY MR. RUDE:
4      Q.  I'm going to ask you if you have that in front
5  of you.
6      A.  Yes, I do.
7      Q.  Have you ever seen that document before?
8      A.  Yes.
9      Q.  Can you state what it is?
10     A.  This is a copy of the statement I made to the
11 police officers.
12     Q.  I'm going to direct your attention to paragraph
13 No. 15 at the bottom. Do you have that in front of you?
14     A.  Do you mean the statement? Or the Management
15 Employee Manual?
16     Q.  No. It would be Exhibit No. 2. It's the
17 witness statement.
18     A.  Yes, sir.
19     Q.  There's a series of numbered boxes. Do you see
20 that?
21     A.  Yes.
22     Q.  I'm going to draw your attention to box No. 15.
23 Do you see that?
24     A.  Yes, sir.
25     Q.  Is that your signature?

## Page 11

1      A.  Yes.
2      Q.  I'm going to ask you to take a look at page
3  No. 2 and page No. 3. Same box numbers. Is that your
4  signature?
5      A.  Yes, it is.
6      Q.  Mr. Sylvester, I'm going to ask you whether or
7  not this was your statement provided to the metropolitan
8  police department on July 2, 2004.
9      A.  Yes, it was.
10     Q.  Are the contents of the statement true and
11 correct to the best of your knowledge, information, and
12 belief?
13     A.  Yes.
14         MR. RUDE: I'm going to ask you to take a look
15 at plaintiff's Exhibit No. 3.
16         (Plaintiff's Exhibit No. 3 was marked.)
17         MR. LOEB: For the record, I'll object, to the
18 extent it comes up when Mr. Sylvester's deposition is
19 offered at trial -- if it is. I'll object to the
20 admissibility of this exhibit.
21         Go ahead. That's Exhibit 3. Go ahead.
22 BY MR. RUDE:
23     Q.  Mr. Sylvester, do you have Exhibit No. 3 in
24 front of you?
25     A.  Yes.

## Page 12

1      Q.  Have you ever seen this document before?
2      A.  Yes.
3      Q.  What is it?
4      A.  Oceanside Management Corporation Employee Manual
5  General Information.
6      Q.  Have you ever seen this document before?
7      A.  Yes.
8      Q.  When did you first see it?
9      A.  Upon my initial hiring with Tony & Joe's.
10     Q.  I'm going to draw your attention to page No. 6.
11 Do you have that in front of you?
12     A.  Yes.
13     Q.  I'm going to draw your attention to the last
14 underlined paragraph, that starts with, "Violations that
15 will result in immediate termination."
16         Do you see that?
17     A.  Yes.
18     Q.  Who hired you at Tony & Joe's?
19     A.  I was hired by Rob Puzio.
20     Q.  What did Mr. Puzio tell you about this
21 employment manual?
22         MR. LOEB: Objection --
23         MR. TAPP: Object to the entire contents that
24 it's irrelevant.
25         MR. LOEB: I join in that objection. Join in

## Page 17

1  now that we've finished our discussions on this. You saw
2  Jonathan Rude at closing time. Is that correct?
3  A.  Yes.
4  Q.  Where was he when you saw him?
5  A.  Outside.
6  Q.  Did you see him again after that?
7  A.  Yes.
8  Q.  Where was he when you saw him the second time?
9     MR. LOEB: Objection. Vague and ambiguous. No
10 time frame.
11    MR. RUDE: I'm going to disagree.
12 Q.  Go ahead, Mr. Sylvester. Answer the question.
13 A.  We were both at the inside bar.
14 Q.  Did you speak with him again?
15 A.  Yes.
16 Q.  What did you speak about?
17    MR. LOEB: Objection. Hearsay.
18 BY MR. RUDE:
19 Q.  Go ahead, Mr. Sylvester. Answer the question.
20 What did you speak about?
21 A.  The manager, Rob Puzio, told me to ask Mr. Jon
22 Rude to leave.
23 Q.  Did he tell you why he wanted him to leave?
24    MR. LOEB: Objection. Hearsay.
25    THE WITNESS: The reason for asking Mr. Rude to

## Page 18

1  leave was because Yinka was angry with him.
2  BY MR. RUDE:
3  Q.  Did he say why Yinka was angry with him?
4     MR. LOEB: Objection. Hearsay.
5     THE WITNESS: He didn't specify why.
6  BY MR. RUDE:
7  Q.  Where was Olayinka Adeboyeku and Anthony Wood
8  when you were speaking with Jon Rude?
9  A.  I do not know where they were.
10 Q.  Approximately what time did this conversation
11 with Jon Rude occur?
12 A.  Almost immediately after closing, which I
13 believe was right around 2:00, 2:15.
14 Q.  Okay. Did there come a time when two
15 metropolitan police officers entered Tony & Joe's?
16    MR. LOEB: Objection. Vague and ambiguous. No
17 time frame.
18    THE WITNESS: Yes.
19 BY MR. RUDE:
20 Q.  I'm going to ask you to answer, Mr. Sylvester.
21 A.  Yes.
22 Q.  Approximately when was that?
23 A.  A little before 3:00.
24 Q.  Okay. Let's backtrack here. After your
25 conversation with Mr. Rude, where you indicated that

## Page 19

1  Robert Puzio wanted him to leave, was -- did you -- do you
2  know an individual named Robert Owen?
3  A.  Yes.
4  Q.  Who is Robert Owen?
5  A.  Officer Rob Owen is a police officer with the
6  metropolitan police department, who also worked, I
7  believe, security for the waterfront area.
8  Q.  Do you know an individual by the name of Glen
9  Luckett?
10 A.  Yes.
11 Q.  Who is Glen Luckett?
12 A.  Officer Luckett is employed in the same fashion
13 as Officer Owen. They both were hired by the building
14 structure to provide security.
15 Q.  Did you see Mr. Owen and Mr. Luckett that
16 evening.
17    MR. LOEB: Objection. Asked and answered.
18 BY MR. RUDE:
19 Q.  Go ahead and answer, Jay.
20 A.  Yes.
21 Q.  When did you see them?
22 A.  Officer Luckett -- I saw him earlier in the
23 evening. I saw Officer Owen in the main bar after
24 closing.
25 Q.  What was Officer Owen doing?

## Page 20

1  A.  Officer Owen was talking with Jon about whether
2  or not Jon Rude should speak with Yinka.
3  Q.  Did you --
4     MR. LOEB: Object to the -- move to strike the
5  answer as nonresponsive. Go ahead.
6  BY MR. RUDE:
7  Q.  Mr. Sylvester, did you hear any of that
8  conversation?
9  A.  Yes.
10 Q.  Do you recall what Mr. Rude said to Mr. Owen?
11    MR. LOEB: Objection. Hearsay.
12    Go ahead.
13    THE WITNESS: Mr. Rude said that he had no
14 problem with Yinka, and would talk to him if he would
15 like. Officer Owen instructed Jon that would be a bad
16 idea, and to just leave.
17 BY MR. RUDE:
18 Q.  Was there anyone else present at that
19 conversation?
20 A.  I don't remember.
21 Q.  Do you know an individual named Michael Gillman?
22 A.  Yes.
23 Q.  Who is Mr. Gillman?
24 A.  Mr. Gillman and I were roommates in college.
25 Q.  Do you know whether Mr. Gillman was employed?

**Page 21**

1    A. Yes.
2    Q. Where was he employed?
3    A. Mr. Gillman was also a bouncer at Tony & Joe's.
4    Q. Do you know if he was working on June 26th and
5 27th?
6    A. Yes.
7    Q. Did you see Mr. Gillman with Jonathan Rude?
8       MR. LOEB: Objection. Vague and ambiguous. No
9 time frame.
10 BY MR. RUDE:
11    Q. Go ahead and answer the question.
12    A. Yes, I did.
13    Q. Where were they when you saw them?
14    A. Mike Gillman, Jon Rude, John's friend Sam, and
15 Sam's cousin were all at the inside bar.
16    Q. What did these individuals do after Jon Rude
17 spoke with Mr. Owen?
18    A. I didn't catch the end of that conversation. I
19 went into the back room to continue filling beer coolers.
20    Q. How long do you estimate you were in the back
21 room?
22    A. I believe, 10, 15 minutes.
23    Q. Okay. Did there come a time that you came back
24 to the main bar area?
25    A. Yes.

**Page 22**

1    Q. What did you see when you came back to the main
2 bar area?
3    A. As I was walking through the door, I saw Yinka
4 and Tony Wood running through the bar -- running from the
5 restaurant out the front door of the bar.
6    Q. Did Olayinka Adeboyeku speak to you?
7    A. Yes, he did.
8    Q. What did he say?
9       MR. LOEB: Objection. Hearsay.
10       THE WITNESS: Yinka said, "I fucking hate those
11 Georgetown kids. After I knock him out, I'm going to come
12 back and knock you the fuck out."
13 BY MR. RUDE:
14    Q. Did you have any understanding of who he was
15 referring to when he said "knock him out"?
16       MR. LOEB: Objection --
17       MR. TAPP: Speculation.
18       MR. LOEB: -- speculation.
19 BY MR. RUDE:
20    Q. Go ahead and answer if you can.
21    A. Yes. He was speaking about Jon Rude.
22    Q. Did Anthony Wood say anything to you?
23    A. Yes.
24       MR. LOEB: Objection. Hearsay.
25 ///

**Page 23**

1 BY MR. RUDE:
2    Q. Go ahead, Mr. Sylvester.
3    A. Yes. Mr. Wood spoke to me.
4    Q. What did he say?
5       MR. LOEB: Objection. Hearsay.
6       THE WITNESS: He told me -- Mr. Wood told me not
7 to worry about Yinka; that he would take care of it.
8 BY MR. RUDE:
9    Q. What did Olayinka Adeboyeku and Anthony Wood do
10 after they spoke to you?
11    A. They both ran out the front door.
12    Q. Did you see which direction they ran?
13    A. I do not know for sure.
14    Q. Okay. Mr. Sylvester, do you know what the --
15 have you ever heard of the concept of banning?
16    A. Yes.
17    Q. Can you state for the record what your
18 understanding of that concept is?
19    A. The manager has to decide that a patron or
20 employee, or whoever, is no longer allowed to return to
21 the premises.
22    Q. To the best of your knowledge, was Jonathan Rude
23 ever banned from Tony & Joe's?
24       MR. LOEB: Objection. Lack of foundation.
25 ///

**Page 24**

1 BY MR. RUDE:
2    Q. Go ahead and answer.
3    A. I have no knowledge of Jon Rude being banned.
4    Q. Let's go to July 2004, specifically July 24,
5 2004. Do you recall that evening?
6    A. Yes.
7    Q. Did you speak to Anthony Wood that evening?
8    A. Yes.
9       MR. LOEB: Objection. Relevance.
10 BY MR. RUDE:
11    Q. Did you speak to Anthony Wood that evening,
12 Mr. Sylvester?
13       MR. LOEB: Same objection.
14       THE WITNESS: Yes.
15 BY MR. RUDE:
16    Q. What did Mr. Wood talk to you about?
17       MR. LOEB: Objection. Hearsay.
18       MR. TAPP: Objection. Relevance, as well.
19       MR. RUDE: Your objections are noted. Now he
20 can answer.
21       THE WITNESS: Mr. Wood told me that Yinka
22 threatened to harm me. I believe -- I don't remember the
23 exact words. But the understanding was that Yinka
24 threatened to kill me.
25 ///

**Page 33**

1    A.  George Washington University Hospital.
2    Q.  After that late night, early morning hours, did
3  you see Mr. Wood again, after he had returned to the bar,
4  the following day, the next day, the next day?
5    A.  I'm sorry.  Are you asking about Mr. Wood or
6  Mr. Rude?
7    Q.  Mr. Wood.  I'm sorry.  Mr. Wood.
8    A.  After they, "they" being Mr. Adeboyeku and
9  Mr. Wood, left the bar, Mr. Wood came back in, according
10  to my statement, at approximately 10:45 a.m.  He and I
11  spoke about Mike Gillman being wrong.  Then the police
12  officers arrived.  And I left before the police officer
13  and Mr. Yinka had finished their conversation.
14    Q.  Do you know whether Mike Gillman choked
15  Mr. Adeboyeku?
16        MR. RUDE:  I'm going to object as to speculation
17  and hearsay.
18  BY MR. TAPP:
19    Q.  Do you know for a fact?  Do you have personal
20  knowledge of that?
21    A.  I don't know what happened outside of the bar.
22        MR. TAPP:  Okay.  I don't have anything else.
23        MR. RUDE:  Thank you.
24  ///
25  ///

**Page 34**

1        EXAMINATION
2  BY MR. LOEB:
3    Q.  Mr. Sylvester, this is Dan Loeb again, to keep
4  the voices clear.  I have a few questions, as well.
5        You testified about your conversation with
6  Mr. Adeboyeku the night of the 26th/27th of June.  Do you
7  know whether anyone else, besides yourself, heard whatever
8  it is you alleged Mr. Adeboyeku said to you?
9    A.  Other than Mr. Wood, I am not sure.
10    Q.  Do you know whether Mr. Wood heard it or not?
11    A.  Yes.  I do know that Mr. Wood heard it.
12    Q.  Isn't it true, Mr. Sylvester, that when the two
13  of them were running through the bar, that Mr. Wood was
14  slightly behind Mr. Adeboyeku?
15    A.  Yes.
16    Q.  But nevertheless, it's your testimony that
17  Mr. Wood heard Mr. Adeboyeku's statements?
18    A.  Yes.  Mr. Wood spoke to me about Mr. Adeboyeku's
19  statement.
20    Q.  Did he talk to you about the statements or the
21  actions that -- that were going on then, or do you know?
22    A.  When they were running through, Yinka spoke to
23  me.  Then under two seconds later, Mr. Wood spoke to me
24  directly about Yinka threatening to fight me.
25    Q.  Actually, what Mr. Wood said to you is something

**Page 35**

1  to the effect of, "Don't worry about it.  I've got it."
2  Is that correct?
3    A.  Yes.
4    Q.  Did you ever have a conversation about what he
5  meant by that statement with him?
6    A.  No, I did not.
7    Q.  So do you know -- I take it you don't know
8  whether Mr. Moran, who you testified earlier may have been
9  nearby, heard these comments.  Is that correct?
10    A.  I cannot say for sure.
11    Q.  You didn't report either Mr. Adeboyeku's
12  comments or Mr. Wood's comments to Mr. Moran.  Is that
13  correct?
14    A.  Correct.
15    Q.  And you didn't report them to Mr. -- I believe
16  there was a manager, perhaps on duty that night,
17  Mr. Eagleton.  You didn't report it to him, did you?
18    A.  Mr. Eagleton worked at Riverside Grill.  But no.
19  I did not.
20    Q.  You didn't report it to Mr. Puzio, did you?
21    A.  No, I did not.
22    Q.  You didn't report it to any other manager or
23  supervisor that was on duty that night.  Is that correct?
24    A.  That is correct.
25    Q.  You mentioned Officers Owen and Luckett.  You

**Page 36**

1  never told them that night about the alleged statement by
2  Mr. Adeboyeku.  Is that correct?
3    A.  Both officers were already gone.
4    Q.  So the answer to the question is no.  Is that
5  right?
6    A.  Correct.
7    Q.  You never reported it at that time to any other
8  metropolitan police officer.  Is that correct?
9    A.  Correct.
10    Q.  And you were Mr. Rude's -- Jon Rude's, that is.
11  Mr. Rude's roommate at this time.  Is that correct?
12        MR. RUDE:  I'm going to object as lack of
13  foundation there.
14  BY MR. LOEB:
15    Q.  Did you live with Mr. Rude in June of 2004 or
16  not?
17    A.  Yes.
18    Q.  So is it fair to call you roommates?
19    A.  Yes.
20    Q.  Do you know whether Mr. Rude had a cell phone in
21  June of 2004?
22    A.  I believe he did.
23    Q.  In 2004, did you know his cell phone number?
24    A.  Yes.
25    Q.  Did you, that evening, attempt to reach him on

### Page 29

1  Q. Did he wait inside the bar or outside the bar?
2  A. If he was going to give me a ride home, he would
3  have been allowed inside the bar.
4  Q. Do you remember him being inside or outside?
5  A. My mistake. I didn't understand what you said.
6  Q. Do you recall whether he -- not what you
7  typically do. On this particular occasion, did he remain
8  in the bar or did he wait outside? Or you just don't
9  know.
10  A. He was inside the bar. The main bar. The
11  inside bar.
12  Q. When in relation -- at some point in time he
13  left the bar, did he not?
14  A. Yes.
15  Q. How much time had he been gone, if you know, as
16  from when you saw Tony Wood and Yinka running through the
17  restaurant?
18  A. I do not know how long Jon had left before they
19  ran through.
20  Q. Do you know whether Jon spoke with Yinka or
21  Mr. Wood prior to him leaving the bar?
22  A. I do not know.
23  Q. It's your testimony -- you said Mr. Wood and the
24  person you referred to as Yinka were running toward the
25  bar toward the front door?

### Page 30

1  A. Yes.
2  Q. Were they running at full speed?
3  A. Yes.
4  Q. I'm sorry. You said yes?
5  A. Yes. I did.
6  Q. It's your testimony -- I assume that as they
7  were running through the bar at full speed, Yinka stopped
8  to speak to you. Is that correct?
9  A. Yes.
10  Q. Obviously, Mr. Wood continued running toward the
11  front door. Is that right?
12  A. Mr. Wood also stopped.
13  Q. Okay. They were both running at full speed
14  toward the front door, but both of them stopped where you
15  were to have a conversation about something that had --
16  was going to happen outside? Is that correct?
17  A. Yes.
18  Q. Did they resume running at full speed?
19  A. Yes.
20  Q. Was anybody else with you at the time that
21  Mr. Yinka or Mr. Wood said something about what they were
22  intending to do or were going to do?
23  A. Yes.
24  Q. Who was that?
25  A. I believe it was Chuck Moran.

### Page 31

1  Q. After they continued -- I assume they continued
2  out the front door. Is that right?
3  A. Yes.
4  Q. Do you know where they went, personally? Did
5  you see where they went?
6  A. No. I did not specifically see.
7  MR. RUDE: I don't mean to interrupt. Could we
8  note for the record that when we speak the word "Yinka,"
9  we are actually referring to Olayinka Adeboyeku?
10  MR. TAPP: Mr. Adeboyeku.
11  MR. RUDE: We just want to be sure the record is
12  clear here. Thank you.
13  BY MR. TAPP:
14  Q. After they departed the front door running at
15  full speed, how much time passed, if any, before you saw
16  them again that same night?
17  A. I'm not sure how much time elapsed before
18  Mr. Wood came back into the bar.
19  Q. Mr. Adeboyeku. Did he return to the bar that
20  night?
21  A. I didn't see him again.
22  Q. Did you speak to Mr. Wood upon his return?
23  A. Yes, I did.
24  Q. When Mr. Wood indicated to you in your statement
25  that Mike was wrong, and he shouldn't have choked Yinka --

### Page 32

1  A. Yes.
2  Q. Who is Mike?
3  A. Mike is in reference to Mike Gillman.
4  Q. Is Mike Gillman a football player at Georgetown,
5  or was a football player at Georgetown?
6  A. Yes. Mike Gillman was the kicker.
7  Q. Did you play for Georgetown, also?
8  A. Yes, I did.
9  Q. What position did you play?
10  A. I was an offensive lineman.
11  Q. Did Mr. Rick Rude play for Georgetown? Jon
12  Rude. I'm sorry.
13  MR. RUDE: If I can interject for a moment, I'd
14  like to note an ongoing objection to relevance. But I
15  don't mean to interrupt you, Mr. Tapp.
16  BY MR. TAPP:
17  Q. Did he play ball at Georgetown, also?
18  A. Yes, he did.
19  Q. What position?
20  A. Fullback.
21  Q. What was the next time after that evening -- or
22  late night/early morning hours that you saw Mr. Rude
23  again?
24  A. I didn't see Mr. Rude again until that Sunday.
25  Q. Where was that?

### Page 61

1  address and phone number, please?
2     A.  My phone number?
3     Q.  Yes.
4     A.  202-270-1108.
5     Q.  And your address?
6     A.  2/1 Camp Horno, Camp Pendleton, California
7  92055.
8     Q.  I believe you're married. Is that correct,
9  Mr. Sylvester?
10    A.  Yes.
11    Q.  Does your spouse live with you at that address?
12    A.  Sir, that is my work address.
13    Q.  Could I have your home address, please?
14    A.  Sir, your client has threatened my life. I
15 don't feel it's pertinent to give you my home address.
16       MR. LOEB: I'll object to that answer as
17 nonresponsive.
18    Q.  Let me ask you this, Mr. Sylvester: Do you
19 currently live at 2436 Catalina Circle, Apartment 648,
20 Oceanside, California?
21    A.  No, sir.
22    Q.  You are declining to give me your address today.
23 Is that correct?
24       MR. RUDE: Mr. Loeb, we can give and procure
25 Mr. Sylvester's address information, if you want, pursuant

### Page 62

1  to our confidentiality agreement. But he has very
2  legitimate concerns regarding --
3        MR. LOEB: Fair enough.
4        MR. RUDE: -- the prior conduct that arose in
5  this litigation.
6        MR. LOEB: I understand.
7     Q.  Mr. Sylvester, after the events on -- whatever
8  they were, June 26 and 27 of 2004, so about 2 1/2 years
9  ago, have you ever seen Mr. Adeboyeku again?
10    A.  No, sir -- excuse me. Excuse me. I did see him
11 in court.
12    Q.  Other than that, have you ever seen him again?
13    A.  No, sir.
14    Q.  Has he ever tried to contact you?
15    A.  I didn't specifically see him, but the manager,
16 Dean Sibble, said he was at the bar one night when I
17 wasn't there, off work.
18    Q.  What year are we talking about?
19    A.  2004.
20    Q.  But other than -- but you didn't see him then.
21 Is that correct?
22    A.  No, I did not.
23    Q.  So have you seen him again since June of 2004,
24 other than at trial?
25    A.  No, sir.

### Page 63

1     Q.  Has he, to your knowledge, ever tried to contact
2  you between June of 2004 and today?
3     A.  No, sir.
4        MR. LOEB: I have no further questions at this
5  time, Mr. Sylvester. I really appreciate you taking the
6  time.
7
8            FURTHER EXAMINATION
9  BY MR. RUDE:
10    Q.  Just for clarification here. Mr. Sylvester, you
11 were asked about when -- I realize I'm going back here
12 quite aways. It's been the better part of 45 minutes.
13       You were asked when you first saw Jonathan Rude.
14 I'm going to draw your attention to page 1 of Exhibit 2.
15 Do you have that in front of you?
16    A.  Yes, sir.
17    Q.  The third line down of your written statement.
18 Do you see that?
19    A.  "I do not know Sam's last name"?
20    Q.  Yes.
21    A.  Yes, sir.
22    Q.  Does that line and that following sentence help
23 you identify when you first saw him?
24       MR. LOEB: Object to the question.
25    ///

### Page 64

1  BY MR. RUDE:
2     Q.  Does that help you, Mr. Sylvester?
3     A.  Yes, sir.
4     Q.  What was the approximate time that you saw Jon
5  Rude that night?
6        MR. LOEB: Object to the question.
7  BY MR. RUDE:
8     Q.  Go ahead and answer, Mr. Sylvester.
9     A.  Approximately 2:00 a.m.
10       MR. RUDE: I have nothing further. Do you have
11 anything further, Mr. Tapp?
12       MR. TAPP: No.
13       MR. RUDE: Mr. Sylvester, your testimony will be
14 prepared by the court reporter there. You have the option
15 of signing or waiving. If you trust the accuracy of the
16 court reporter, you can go ahead and waive your signature.
17 Or otherwise, she will have to prepare it, send it to you
18 for review, and you will have to execute the document and
19 send it back to her.
20       Which do you prefer to do?
21       THE WITNESS: I'm sorry. If I waive my
22 signature, then I just go with the way it is right now?
23       MR. RUDE: Yeah.
24       THE WITNESS: I would prefer to do that.
25       MR. RUDE: You're waiving signature?

# METROPOLITAN POLICE DEPARTMENT
## WASHINGTON D.C.
### COMPLAINANT / WITNESS STATEMENT

**1. COMPLAINT NO.** 088-184

**2. NATURE OF INVESTIGATION:** Aggravated Assault

**3. UNIT FILE NO.**

**4. STATEMENT OF: (Last, First, Middle)** Sylvester, James Stephen

**5. DOB:** [redacted]

**6. SEX:** M

**7. HOME ADDRESS:** [redacted]

**8. HOME PHONE:** [redacted]

**9. EMPLOYMENT (Occupation and Location):** Tony and Joe's Seafood Place, 3100 K St. NW

**10. BUSINESS PHONE:** —

**11. LOCATION STATEMENT TAKEN:** 2D

**12. NAME OF OFFICER TAKING STATEMENT:** Morais, Nelson #02-293

**13. DATE / TIME STARTED:** 7-2-04 / 1540

**14. STATEMENT**

I was working as a doorman at Tony and Joe's the night of June 26, 2004. Jon Rude came to the bar with his friend Sam, and Sam's cousin. I do not know Sam's last name or his cousin's name. Around 2:00 am the Morning of June 27, Jon, Sam, and Sam's cousin entered Tony and Joe's inside bar and offered to give Mike Gillman and me a ride home. I declined the offer, and Mike accepted. Soon after Jon, Sam, and Sam's cousin entered the Bar a manager, either Dean or Rob Puzio told me to ask Jon to leave because Yanka was angry with Jon. I asked Jon to leave, then he and Officer Rob Owen got into a discussion where Jon said he "did not have a problem with Yanka and would talk to him if he wanted to." Officer Owen told Jon it was better not to even see Yanka. During the rest of the conversation I was in the back room doing more work. When I returned

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME, FULLY UNDERSTAND IT, AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES, D.C. CODE SECTION 22-2514.

**16. DATE / TIME ENDED:** 7-2-04 / 1630

**17. PAGE** 1 **OF** 2 **PAGES**

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:** [signature]

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**



PLAINTIFF'S EXHIBIT 2 — 12-11-2006

Ex. 2
WITNESS: Sylvester
DATE: 12-11-6  Rptr: Ka
Shelburne Sherr Court Reporters

# METROPOLITAN POLICE DEPARTMENT
## WASHINGTON D.C.
### COMPLAINANT / WITNESS STATEMENT

| Field | Value |
|---|---|
| 1. COMPLAINT NO. | 088-184 |
| 2. NATURE OF INVESTIGATION | Aggravated Assault |
| 3. UNIT FILE NO. | |
| 4. STATEMENT OF: (Last, First, Middle) | Sylvester, James Stephen |
| 5. DOB | [redacted] |
| 6. SEX | M |
| 7. HOME ADDRESS | [redacted] |
| 8. HOME PHONE | [redacted] |
| 9. EMPLOYMENT (Occupation and Location) | Tony and Joe's  3100 K St NW |
| 10. BUSINESS PHONE | — |
| 11. LOCATION STATEMENT TAKEN | 2D |
| 12. NAME OF OFFICER TAKING STATEMENT | Morais, Nelson #D-293 |
| 13. DATE/TIME STARTED | 7-2-04 1540 |

**14. STATEMENT** to the main bar area everyone was gone. A few seconds later Yanka and Tony Wood came running through the restaurant to the front door where Yanka turned to me and said "I fucking hate those Georgetown kids. After I knock him out I am going to come back and knock you the fuck out." I assumed Jon had already driven home so I did not think anything of it, and went back to filling beer coolers. Around 2:45 am Tony Wood returned to the bar and told me what happened "Your man Mike was wrong, he shouldn't have choked Yanka." Tony Wood told me more but I honestly cannot remember what he said. Shortly after that around 3:00 am I think the two Metropolitan Police Officers arrived at Tony and Joe's. I left the bar around 3:15-3:30

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES D.C. CODE SECTION 22-2514.

| 16. DATE / TIME ENDED | 7-2-04 1620 |
|---|---|
| 17. PAGE 2 OF 3 PAGES | |

18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15: [signature]
19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:

2·2

**METROPOLITAN POLICE DEPARTMENT**
**WASHINGTON, D.C.**

**COMPLAINANT / WITNESS STATEMENT**

PD 119 Rev 7/74

**1. COMPLAINT NO.** 088-184

| | |
|---|---|
| **2. NATURE OF INVESTIGATION** Aggravated Assault | **3. UNIT FILE NO.** |
| **4. STATEMENT OF: (Last, First, Middle)** Sylvester, James Stephen | **5. DOB** [redacted] **6. SEX** M |
| **7. HOME ADDRESS** [redacted] | **8. HOME PHONE** [redacted] |
| **9. EMPLOYMENT (Occupation and Location)** Tony and Joe's 3100 K St NW | **10. BUSINESS PHONE** — |
| **11. LOCATION STATEMENT TAKEN** 2D | |
| **12. NAME OF OFFICER TAKING STATEMENT** Morais, Nelson #02-293 | **13. DATE/TIME STARTED** 7-2-04 1540 |

**14. STATEMENT**

On July 2, 2004 I was shown a single photo by Detective Morais and identified the person as Yinka

Q: How long have you known Yinka?
A: about Two months
Q: did you do or say anything That would provoke Yinka To Threaten?
A: No
Q: did John do anything That night That would provoke Yinka to fight with him?
A: Nothing That I saw
Q: Is There anything else you would like To add?
A: No

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. I UNDERSTAND THAT MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES. D.C. CODE SECTION 22-2514.

**16. DATE / TIME ENDED** 7-2-04 1620

**17. PAGE** 3 **OF** 3 **PAGES**

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:** [signature]

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**

2·3