CASE NO. 05CV1274(RCL)
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
# ATTACHMENT NO. 4

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3

4    ------------------------x

5    JONATHAN W. RUDE,

ORIGINAL

6        Plaintiff,

7        vs.                    Case No. 1:05cv1274RCL

8    OLAYINKA ADEBOYEKU

9        and

10   ANTHONY B. WOOD,

11       Defendants.

12   ------------------------x

13

14

15       Deposition Duces Tecum of ANTHONY B. WOOD

16             Washington, D.C.

17        Thursday, November 15, 2007

18              1:15 p.m.

19

20   Job No. 2-115982

21   Pages 1 - 80

22   Reported by Judith F. Richard, RPR



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

31

1    things clarified, which is why we're here.  Okay?

2        A.    No problem.

3        Q.    I am going to ask you a couple questions

4    about several statements that you made in July 2006,

5    and I'm going to hand you the page.  We're not going

6    to mark it as an exhibit because it's already in the

7    deposition.

8        A.    Thank you.

9        Q.    I'm looking at page 64, and if you can

10   look at lines 19 through 22.  Do you see that?

11       A.    Yes.

12       Q.    I'm going to ask you specifically in your

13   conversation with Officer Robert Owen, I see here

14   you said:  These two guys have a problem.  Who are

15   these two guys?

16       A.    Yinka and your son.

17       Q.    How did you know there was a problem?

18       A.    It was on ongoing situation with Yinka,

19   John Cummings, and a couple other guys.  That night

20   is not the first night that they had a run-in.

21       Q.    This is my question.  What did you mean

22   by problem?  I guess that's the question I'm having

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

32

1    here.

2              MR. TAPP:  Same objection to the question

3    being irrelevant and repetitive.  Same question has

4    been asked and answered before.

5              THE WITNESS:  Each individual are their

6    own man.  I can't make a man not do anything, if

7    that's what you're asking me.

8    BY MR. RUDE:

9        Q.    Basically what I'm asking you, all right,

10   is when you made this statement, it's actually three

11   things.  First of all, you say there is a problem;

12   secondly, that you can't do anything to stop it; and

13   thirdly, you're asking Officer Owen, I take it, to

14   do something.  Do you see that?

15       A.    Yes.

16       Q.    And I'm looking for some clarification

17   here.

18       A.    Okay.  The clarification is how we came

19   up in the district that Officer Owens works in.  If

20   two men fight hand to hand, no weapons, the police

21   let them fight for five minutes.  That is an

22   unwritten rule on the streets not far from here.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

33

1    Now, if you're asking me to say that I asked Mr.

2    Owens not to do his job or turn away, no, that was

3    not the intention.  So that you can understand it in

4    our terminology, when two men have an altercation,

5    two men handle it with their hands, not with guns,

6    not with knives, not with sticks, but with their

7    hands.

8        Q.    So just so that I'm clear here, because

9    you're correct, I don't necessarily understand your

10   terminology, it was your belief at this time that

11   there was a dispute between Yinka and a guy named

12   J. C. and Jonathan Rude, and you said several other

13   people.

14              MR. TAPP:   Objection to the question.

15   You're characterizing.

16              MR. RUDE:   I realize I'm characterizing

17   this, Mr. Tapp, because I'm trying to interpret what

18   he's saying.

19              MR. TAPP:   You characterize it as a

20   dispute.  He testified before it was more than

21   a dispute.  Your son attacked Yinka and Yinka

22   retaliated.  You're saying dispute.  It was more

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

34

1    than a dispute.

2    BY MR. RUDE:

3        Q.    Now, I'm going to ask you very clearly:

4    When did my son attack Yinka?  When did Jonathan

5    Rude attack Olayinka Adeboyeku?

6        A.    All I know is your son and John Cummings

7    were in a car in the garage.  Who was right, who was

8    wrong I do not know.  But then your son returned,

9    knowing that that just happened, and that young man,

10   Olayinka, went off.  There is nothing that I can do.

11   He is a grown man.

12       Q.    And so at this point -- and we're talking

13   approximately 2 a.m. in the morning on June 27,

14   2004 -- you're talking to Officer Owen.  You're

15   saying to him that Olayinka Adeboyeku and Jonathan

16   Rude have a problem and you expect them to solve

17   that problem with a hand-to-hand fist fight.

18       A.    From Yinka's, the way he was acting, yes,

19   and the bravado of your son, yes.

20       Q.    What did you expect Officer Owen to do?

21       A.    To lock somebody up besides me.

22       Q.    And who did you expect to -- did you

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

43

1      Q.    Okay.   Now, let me ask you this.   Going

2   to your answer number 8, do you see that, second

3   paragraph, sir?

4      A.    Yes.

5      Q.    I am going to ask you what you meant by

6   the following statement:   I told Adeboyeku that if

7   you go out this door, you're going to get into

8   trouble.  Do you see that?

9      A.    Yes.

10     Q.    What did you mean by that?

11     A.    He going to get arrested.

12     Q.    Well, what kind of trouble did you think

13   he was going to get into?

14     A.    He was going to cause some problems.

15     Q.    Well, you knew that Adeboyeku had left

16   Tony & Joe's the week before and gone to the garage,

17   right?

18     A.    Yes.

19     Q.    And so you figured that he was going to

20   leave the premises and go after Jon Rude?

21     A.    Did I believe that?

22     Q.    Yes.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

44

1       A.      I don't know what he was leaving to do.

2   I can't read his mind.

3       Q.      Then what kind of problem --

4       A.      My intention was to keep him inside.

5       Q.      What kind of trouble were you speaking

6   to?  You just said that he was going to get himself

7   arrested.  Arrested for what?

8       A.      Doing something.

9       Q.      But you weren't sure what he was going to

10  do.

11      A.      No.

12      Q.      Were you out on the boardwalk with

13  Adeboyeku when he was tipping over the tables and

14  chairs?

15      A.      It wasn't the boardwalk.  It was by the

16  fountain area, the lower level.

17      Q.      That was on the --

18      A.      In front of Tony & Joe's.

19      Q.      And those were furniture that belonged to

20  Tony & Joe's?

21      A.      Yes.

22      Q.      When Officer Owen walked Michael Gillman

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

45

1    and the other individuals out the back door of Tony

2    & Joe's, what did you do?

3        A.    I went inside Tony & Joe's.

4        Q.    And did you go to the garage with Yinka?

5        A.    Yinka ran out and surprisingly -- I'm 39

6    now.  Yinka's 20-something.  I got high blood

7    pressure and sleep apnea.  Everybody makes me out

8    to be some super guy.  There's no way on earth that

9    I can keep up with Olayinka, being a four-two

10   forty-yard runner.  So I was not stride for stride

11   with him.  I followed him in the garage and told him

12   come on.  Then he ran up the steps to the circle.

13       Q.    Do you have any idea why he went in the

14   garage?

15       A.    No.

16       Q.    Why did you go in the garage?

17       A.    I was behind him trying to bring him

18   back.

19       Q.    In other words, you were trying to stop

20   him before he got into trouble.

21       A.    Yes.

22       Q.    And when he went up the steps after you

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

46

1    warned him about getting into trouble, why did you

2    follow him?

3        A.    To try to keep him out of trouble.

4        Q.    Did do you that?

5        A.    When we got to the circular driveway of

6    3000 K Street, your son and the other two guys,

7    Michael Gilliam and I think the Zarhosh brothers,

8    were already down the street.  At that point, that's

9    when Yinka took off running.  I stayed there.

10   You're on your own now.  And he was walking right

11   by your son and Michael Gilliam walking down the

12   street, down K street, headed towards the movie

13   theater.

14       Q.    Why didn't you call for help?  You had

15   the cell phone numbers, Mr. Wood.

16       A.    I don't even know if I had my cell phone

17   on me.  I can't remember.  You're talking about

18   2004.

19       Q.    Well, if we go back to Plaintiff's

20   Exhibit Number 9, you were making calls at 2:38.

21   Do you see that sir?

22       A.    Yes.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

47

1      Q.    So you had your cell phone, didn't you?

2      A.    I can't say.

3      Q.    Well, where do you put your cell phone

4  when you're not using it?

5      A.    I leave it inside the restaurant.

6      Q.    Where?

7      A.    At the host stand.

8      Q.    Why didn't you go get Tosin?

9      A.    I believe Tosin was talking to Officer

10 Owens on the boardwalk.  Tosin wasn't standing with

11 me and Yinka.

12     Q.    Did you try to get Robert Puzio?

13     A.    No.

14     Q.    So you didn't try to reach out to get any

15 help, did you?

16     A.    No.

17           MR. TAPP:  Are you asking him about help

18 for your son or help for Yinka?

19           MR. RUDE:  Mr. Wood testified that he was

20 attempting to stop Yinka.

21 BY MR. RUDE:

22     Q.    Is that a correct characterization?

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

48

1        A.      Yeah.

2        Q.      And it was also your testimony that you

3    were unable to?

4        A.      Yes.

5        Q.      And isn't it also a fair statement that

6    you knew he was going out there after Jonathan Rude?

7        A.      Once again, I'm not a mind reader.  I

8    don't know what you're going out there to do.  I

9    don't know if you're going out there to talk, you're

10   going out there to fight or whatever.  But once

11   again, my intention was to keep him out of trouble.

12   Once again, we're talking about a fullback starter

13   for some football team.  There's no way in the world

14   that I can keep up with him physically.

15       Q.      In other words, you couldn't stop him.

16   And you don't know why he ran after Jonathan Rude?

17       A.      That's something that you have to ask

18   him.

19       Q.      Mr. Wood, I am not going to mark this as

20   an exhibit, but I am going to provide you a copy of

21   an amended complaint that was filed sometime, I

22   believe, in September.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

51

1          THE WITNESS:  I was off the clock at that

2    time.  And I saw a coworker being jumped by two

3    other coworkers and he had two other dudes standing

4    there looking.

5    BY MR. RUDE:

6         Q.    There wasn't any group attack, was there?

7         A.    Group?  It was two guys on one:  your son

8    and Michael Gilliam.  Michael Gilliam had Yinka in

9    a yoke hold from behind while Yinka and Jon Rude

10   were clenching each other.  To me that's not a fair

11   fight when your son at that time was bigger than

12   Yinka.

13        Q.    So just so we're clear on this, you went

14   down there to make sure it was a fair fight?

15        A.    Yeah, because at the time from what I

16   saw, he was being jumped by two Georgetown football

17   players.

18        Q.    And you tackled him on a cement sidewalk,

19   Mr. Wood?

20        A.    I don't know if it was cement, grass.

21   I don't know.

22             MR. RUDE:  Now, we're going to mark

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

52

1    (sic).

2    BY MR. RUDE:

3         Q.    Mr. Wood, do you remember your arrest on

4    June 27, 2004?

5         A.    Yes, no.  I remember getting arrested.

6         Q.    Do you remember being taken to the police

7    station?

8         A.    Yes.

9         Q.    Do you remember an interview?

10        A.    Yes.

11             MR. TAPP:  Objection to this line of

12    questions.  They have been asked and answered.

13             MR. RUDE:  Your objection is noted.  And

14    it was not asked and answered, because these

15    documents were not procured until almost two months

16    after the deposition.  So I notice your objection,

17    and we'll go ahead and we can fight it out with the

18    judge.  I'm going to mark this as Exhibit Number 11.

19    There you go, Mr. Tapp.

20             (Plaintiff's Deposition Exhibit No. 11

21    was marked for identification.)

22             MR. RUDE:  I'm going to ask Mr. Wood to

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

53

1    take a few minutes and read this transcript.  We can

2    go off the record while he's doing that.

3                 (Recess was taken, 2:10 to 2:17 p.m.)

4                 MR. RUDE:  Let's go back on the record.

5    BY MR. RUDE:

6         Q.    Mr. Wood, I note for the record that you

7    have been shown a copy of a transcript marked as

8    Plaintiff's Exhibit Number 11.  I am going to ask

9    you whether, to the best of your recollection, that

10   is a true and and correct copy of the statement you

11   provided to the police on June 27, 2004.

12        A.    Yes.  That is correct.

13        Q.    I would like to ask you a few questions

14   about that.  Does that document help you remember

15   anything a little bit better?

16        A.    No, sir.

17        Q.    I'd like to draw your attention to page

18   3.  Do you have that in front of you?

19        A.    Yes, I do.

20        Q.    And I'm going to ask you to go down to

21   lines 17 through 19.  Do you see that?

22        A.    Yes.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

54

1      Q.    Who was it that got into an altercation

2   at that time?

3      A.    J. C. and Yinka.

4      Q.    Jon Rude wasn't involved, was he?

5      A.    He was standing there.

6      Q.    Now, going down to lines 21 through 24,

7   you say this is hearsay.  Isn't it a fact that Yinka

8   told you that he had left and gone after them, to

9   the parking lot?

10     A.    Yes.

11     Q.    I'd like to have you take a look at page

12  4.  And although this may be repetitive, there is

13  some confusion over the tables and chairs, where

14  they were.  Your earlier testimony this afternoon

15  was that they were in the garden area of Tony &

16  Joe's by the fountain.  There was other testimony

17  that furniture that belonged to the Sequoia was out

18  at the boardwalk.

19     A.    No, sir.

20     Q.    It would have been Tony & Joe's furniture

21  in the lower garden.

22     A.    Yes, sir.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

55

1      Q.    And this all started about 2 a.m.?

2      A.    I can't give you a specific time.

3      Q.    How long do you think this situation took

4  from the time Jonathan Rude walked in till the time

5  you were walking back into Tony & Joe's?

6      A.    When Jonathan Rude walked in, there were

7  no customers in the bar or the restaurant area.  As

8  far as time, I cannot say how long it took.

9      Q.    I'm going to ask you one further

10 question, and this is page 4.  Do you have page 4

11 in front of you?

12     A.    Yes.

13     Q.    If you look at lines 8 and 9 where it

14 says Jon Rude and J. C. were all supposedly banned,

15 how did you know they were banned?

16     A.    How did I know?

17     Q.    Yes, sir.

18     A.    The manager stated so.

19     Q.    What manager was that?

20     A.    I believe either Jonathan Eagleton or

21 Chuck Moore, one of them, because they came down

22 several times and there was incidents with them on

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

56

1    different occasions.

2         Q.    You mean with J. C.

3         A.    J. C. and his entourage, which your son

4    was from time to time with him.

5         Q.    Let's go to page 5.  Do you see there at

6    the top where it says tackled Jon Rude and threw him

7    down?  I know you have previously acknowledged that

8    you tackled Jonathan Rude.

9         A.    Only when Michael Gilliam had Yinka in

10   a choke hold and your son was punching him.  That's

11   why I -- how I ended up tackling your son.  You're

12   trying to make it seem like I viciously attacked

13   your son for no reason.

14        Q.    And I'm going to ask you --

15        A.    And once again --

16        Q.    -- when you say tackle people -- and

17   I don't mean to interrupt you, but let me phrase my

18   question so that you can answer it -- did you tackle

19   him high or low?

20        A.    I can't -- didn't even want to tackle

21   your son.  I wanted to get Michael Gilliam.  But

22   they're in a struggle.  Three men are in a struggle,

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

57

1    three big men that train with weights all the time,

2    because they play football.  So it's not like they

3    they were just standing in one spot.  They were

4    moving.

5        Q.    Are you aware of the fact Michael Gilliam

6    was a kicker?

7        A.    I don't know what he did, but he was just

8    as big as I was.  He wasn't a little, small, frail

9    dude, if that's what you're pertaining to.  Michael

10   Gilliam was just as big as I was.

11       Q.    And what was your height and weight in

12   June of 2004?

13       A.    I'm five 11, 240.

14       Q.    Going back to this question that I have

15   for you, when you tackled someone did you put your

16   arms around him?  How did you tackle him?

17       A.    I can't remember.  I tackled him, because

18   they were mixed in a fight.

19       Q.    Did you take tackle him around his hips

20   or around his shoulders?

21       A.    Wasn't around his shoulders.  He's too

22   tall.  Your son's taller than me.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

58

1    Q.    So it would have been lower.

2    A.    Yes.

3    Q.    You tackled him from the front, is that

4  correct?

5    A.    No.  They were engaged, so it was from

6  the side.  There was no way I could hit him straight

7  on while they're fighting.

8    Q.    So you tackled him from the side, and

9  then what occurred?

10    A.    I'm on top of him.  Yinka tried to kick

11  him.  Yinka broke free from Michael Gilliam.  Yinka

12  tried to kick him.  I blocked it, and I said, you

13  guys got to fight like men, one on one.

14    Q.    You blocked it how?

15    A.    With my arm, because you don't kick a man

16  when he's down.

17    Q.    No, you don't, do you?  Fist fight's one

18  thing, but kicking someone when they're down is

19  something else, isn't it?

20    A.    It's not right.

21    MR. TAPP:  Sounds like he was defending

22  your son, Mr. Rude.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

59

1          MR. RUDE:  I see your comment, but let's

2     see what we can finish here.

3     BY MR. RUDE:

4          Q.    I want to draw your attention to lines

5     4 through 6.  Do you see that?

6          A.    Yes.

7          Q.    You saw Yinka hitting Jon Rude in the

8     facial area with his head hitting the concrete.  So

9     this occurred on concrete.

10         A.    Concrete, dirt, it's all the same there.

11    I don't know for sure.  You're talking about three

12    years ago.

13         Q.    But in June of 2004, you testified it

14    occurred on concrete, correct?

15         A.    In 2004?

16         Q.    Yes.

17         A.    I didn't testify.

18         Q.    If you can take a look at line 5, what

19    does it say?

20         A.    That's when I'm getting interviewed at

21    the police station.

22         Q.    Yes.  And you told him Jonathan Rude's

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

60

1    head was hitting the concrete.

2         A.    Okay.  His head was hitting the concrete.

3         Q.    Yes.  And I would like to draw your

4    attention down to lines 17 through 25, and if you

5    can take a look at that.

6         A.    Mm-hmm.

7         Q.    You were asked whether you were walking

8    with Yinka, and you indicated that you were not.

9    When you're talking six or eight car lengths behind

10   Yinka, I'd like this clarified.  Is it six or eight

11   car lengths from the front of the Washington Harbour

12   complex or just simply six or eight car lengths

13   behind Yinka when you were following him?

14        A.    I'm standing in the driveway.  They're

15   walking down K.  Yinka takes off running.  When

16   Yinka caught up with them, it was right in front

17   of that movie theater.  I said six to eight car

18   lengths.  I don't know -- I'm not exact for sure

19   how far.

20        Q.    It might have been farther?

21        A.    It could have been, but I wasn't walking

22   with Yinka.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

61

1    Q.    Let's go to page 6.  In your previous

2    testimony you, in fact, testified that Yinka runs

3    first at Jonathan Rude and hit him in the head.  Do

4    you recall that?

5    A.    He threw it towards the head area.  I

6    couldn't see them, because they went behind the beam

7    on K Street.

8    Q.    I would like to draw your attention down

9    to lines 6 through 9.  Do you see that?

10    A.    Mm-hmm, yes, I do.

11    Q.    And you say Jon Rude was trying to defend

12    himself?

13    A.    Yeah, because Yinka lunged at him first.

14    Now, who hit who I don't know, but when they came

15    out from behind off the parked car, out from behind

16    the beam, then that's when I saw Michael Gilliam on

17    the back of Yinka.

18    Q.    Going down to lines 18 and 19, do you see

19    that?  I'd like to have you clarify who you were

20    referring to.  It says:  It was never my intention

21    to push him or shove him.  Are you speaking

22    regarding Mike Gillman?

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

62

1    A.    Yes, because Michael Gilliam said that

2  I shoved him, I stopped him, I did something, when

3  I never did anything, where he had no injuries but

4  he said that I stopped him forcibly.

5    Q.    Let's go to page 7.  Do you have that in

6  front of you?

7    A.    Yes, I do.

8    Q.    And again, this is repetitive, lines 1

9  through 3.  And again, you stopped it, you stopped

10  the altercation when Jon Rude's head started hitting

11  the concrete?

12    A.    Yeah, he was losing.  At first they were

13  winning, and then when I came they were losing.

14    Q.    Do you think your intervention might have

15  had anything to do with that?

16    A.    I don't know.  But would we be going

17  through this if Yinka would have got hurt?

18    Q.    Probably.  I would like to have you take

19  a look at lines 4 through 17.  Matter of fact, go

20  all the way down to line 23.

21    A.    Okay.

22    Q.    And go ahead and read it.  Just go ahead

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

63

1    and read it.

2         A.    I read it.

3         Q.    Now, I'm somewhat concerned here, because

4    Mr. Tapp has left the room.  Is that okay with you?

5         A.    Yeah, yes.

6         Q.    How many times did Yinka kick Jon Rude in

7    the head?

8         A.    At two different times.  They both never

9    made contact, but the last one, because I was

10   pushing Yinka off of your son.  So where that one --

11   like I said before, when I pushed him off, he

12   kicked.  Did it hit him in the face, the jaw, the

13   chin, the ear, the head?  He hit him somewhere in

14   that area.  To be exactly, I do not know.  The first

15   kick when your son was on the ground, like I said

16   before, he tried to kick him, I blocked him.

17        Q.    And that was because you were still on

18   top of Jonathan Rude?

19        A.    Yes.  And Yinka must have broke free from

20   Mike Gilliam.

21        Q.    And after Jon Rude was on the ground,

22   according to this, his head was hitting the

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

64

1    concrete.  Was he making any effort to defend

2    himself?

3          A.    I can't remember.

4          Q.    Was he simply laying on the sidewalk?

5          A.    No.

6          Q.    When Yinka kicked him?

7          A.    No.  He jumped straight up, blew his

8    nose.  And I said, is everything over?  They said,

9    yes.  They walked up Wisconsin Avenue, across K

10   Street.  And then after that we left.

11         Q.    Well, let's back up a little bit, because

12   I think we're maybe having a miscommunication

13   question here.  According to your comments and

14   statement on page 7, when you pulled Yinka off Jon

15   Rude, Jon Rude was on the ground, correct?

16         A.    Yes.

17         Q.    And Yinka kicked him in the head,

18   correct?

19         A.    I can't say where he kicked him for sure.

20         Q.    But he kicked him.

21         A.    He tried to kick him, and I was pushing

22   Yinka back.  You don't kick a man when he's down.

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

76

1    Number 11 on page 4.  Do you see that, sir?

2         A.    Yes.

3         Q.    Is it my understanding that Aluatosin did

4    not speak with Jonathan Eagleton that --

5         A.    I can't remember, Mr. Rude.

6         Q.    So you don't remember.  If you could take

7    a look at Number 16, sir.  You have denied the

8    representation that you observed Officer Owen and

9    several other individuals walk toward the back

10   entrance of Tony & Joe's.  Do you see that?

11        A.    (No response.)

12        Q.    Is it your position that, A, you didn't

13   see it, or they didn't walk out the back?

14        A.    They did walk out the back on the

15   boardwalk around Sequoia to get on K Street.  They

16   did not walk out of the front of Tony & Joe's.  Tony

17   & Joe's is made of pretty much all glass, and you

18   could see them walk right through the dining room

19   out the back on the boardwalk.  You could see that

20   from the fountain up.

21        Q.    I would like to direct your attention to

22   number 17.  Do you see that?

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

77

1       A.      Yes.

2       Q.      You have indicated that Olayinka did

3   not -- let me clarify this.  Were you aware or did

4   you understand that Olayinka Adeboyeku wanted to

5   engage in a fist fight with Jonathan Rude on June

6   27?

7       A.      He was very irate.  He was very upset.

8   What he wanted to do, I don't know his exact

9   intentions.

10      Q.      So you had no idea what he had in mind?

11              MR. TAPP:  Objection.  Asked and

12  answered.  Don't answer the question.

13  BY MR. RUDE:

14      Q.      Let's go to number 18.  Is it your

15  position that you did not go out onto the boardwalk

16  area behind the Washington Harbour complex?

17      A.      No, we did not.

18      Q.      Do you know who went out there?

19      A.      Tosin was out there, Yinka's brother.

20      Q.      I would like to direct your attention to

21  number 20.  According to your interview statement,

22  Olayinka was tipping over tables and chairs,

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

78

1     correct?

2          A.     Yes.

3          Q.     So why did you deny number 20?

4          A.     He didn't throw any chairs.  He knocked

5     them over.

6          Q.     So it was just tipping over?  Was he

7     making a lot of noise?

8          A.     I don't understand your gauge of noise.

9          Q.     Was his act of tipping over the tables

10    and chairs making a lot of noise?

11         A.     I can't -- I would say he was making

12    noise, but I can't give you a gauge if it was very

13    loud or quiet or.

14         Q.     All right, but he was making noise.

15         A.     Yes, sir.

16         Q.     I would like to just make sure we're on

17    the same page on number 24, which is page 7.  It's

18    your position that you don't know why Olayinka went

19    to the parking garage?

20         A.     No, I don't know why he went into the

21    parking garage.

22         Q.     I'd like to draw your attention to number

DEPOSITION OF ANTHONY B. WOOD
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

79

1    25.  Isn't this, in fact, correct?  Didn't your

2    answers to interrogatories state that you told

3    Olayinka he was going to get into trouble?

4         A.    Yes.

5         Q.    Let's go to number 27.  On several

6    different occasions you indicated that Olayinka

7    chased after or ran after Jon Rude, Mike Gillman,

8    and the three other individuals.  So wouldn't this

9    also be correct?

10        A.    Yes.

11             MR. RUDE:   I believe that's all I have,

12   Mr. Tapp.

13             MR. TAPP:   Nothing.  We will waive

14   reading.

15             MR. RUDE:   Waive reading, you say?

16             THE REPORTER:   Mr. Tapp, are you ordering

17   a copy of the transcript?

18             MR. TAPP:   Not yet.

19             THE REPORTER:   Mr. Rude?

20             MR. RUDE:   Yes.

21             (Signature having been waived, at 2:53

22   p.m., the deposition of Anthony B. Wood concluded.)

```
 1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2            I, Judith F. Richard, Registered

 3    Professional Reporter, the officer before whom the

 4    foregoing proceedings were taken, do hereby certify

 5    that the foregoing transcript is a true and correct

 6    record of the proceedings; that said proceedings

 7    were taken by me in stenotypy and thereafter reduced

 8    to computer-aided transcription by me; and that I am

 9    neither counsel for, related to, nor employed by any

10    of the parties to the case and have no interest,

11    financial or otherwise, in its outcome.

12            IN WITNESS WHEREOF, I have hereunto set

13    my hand and affixed my notarial seal this 2nd day of

14    December, 2007.

15

16

17

18            Judith F. Richard, RPR

19            Notary Public in and for

20            the District of Columbia

21    My commission expires

22    January 14, 2008
```



PLAINTIFF'S
EXHIBIT
#12
11-15-07 dt

PENGAD-Bayonne, N. J.



**U.S. Department of Justice**

Kenneth L. Wainstein
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

March 7, 2005

*VIA HAND DELIVERY*

Mr. Anthony Wood

Dear Mr Wood:

This letter sets forth the position of the United States Attorney's Office for the District of Columbia with respect to your testimony in connection with the case of <u>United States v. Olayinka Adeboyeku</u>, F-4460-04 & F-4895-04.

This Office does not intend by this letter to grant you transactional immunity from prosecution. That is, we will retain our right to prosecute you for all crimes of any nature that may have been committed by you in the District of Columbia, subject only to the following provisions.

This Office is prepared to grant you "use" immunity as follows. We agree that no testimony provided by you in this matter, or any information directly or indirectly derived from such testimony, will be used against you in any subsequent criminal prosecution of you, <u>except</u> in a prosecution for perjury or for giving a false statement.

Nothing in this agreement shall be construed to permit you to commit any act of perjury, to make any false statements or declarations, to obstruct justice, to commit any other crimes, or to protect you from prosecution for any other crimes.

There are no agreements, promises, understandings, bargains or undertakings between you and the government other than the terms of this letter.

Very truly yours,

KENNETH L. WAINSTEIN
United States Attorney

By: _____

ANTHONY ASUNCION
Assistant United States Attorney

