CASE NO. 05CV1274(RCL)
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
# ATTACHMENT NO. 6

```
SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

                    CRIMINAL DIVISION

----------------------------x
                            :
UNITED STATES OF AMERICA    :
                            :
         v.                 :  Criminal Action No.:
                            :
OLAYINKA ADEBOYEKU,         :     F-4460-04
                            :
              Defendant.    :
                            :
----------------------------x
```

                              Washington, D.C.
                              Tuesday, March 8, 2005

    The above-entitled action came on for a jury trial before the **HONORABLE THOMAS MOTLEY**, Associate Judge, in Courtroom Number 221.


        THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY THE
        COURT, WHO HAS PERSONALLY CERTIFIED THAT
        IT REPRESENTS THE RECORDS OF TESTIMONY
        AND PROCEEDINGS OF THE CASE AS RECORDED.

        APPEARANCES:

        On behalf of the Government:

        JONATHAN W. HARAY, Esquire
        Assistant United States Attorney
        Washington, D.C.

        On behalf of the Defendant:

        REGINALD WILLIAMSON, Esquire
        Public Defender Service
        Washington, D.C.


KATHY E. JACKSON                   Telephone (202) 879-1064
Official Court Reporter

                                                         196

1          THE COURT: Next witness, please.
2    Thereupon,
3                    **ROBERT OWEN**,
4    having been called as a witness by the government, and
5    having been first duly sworn by the Court, was examined and
6    testified as follows:
7          THE WITNESS: Good afternoon.
8          THE COURT: Good afternoon. Could you state your
9    name for the record?
10         THE WITNESS: Officer Robert Owen. Last name
11   spelled O-W-E-N.
12         THE COURT: Counsel, you may proceed for five
13   minutes.
14         MR. HARAY: Thank you, Your Honor.
15                   DIRECT EXAMINATION
16   BY MR. HARAY::
17   Q.   Sir, where do you work?
18   A.   Metropolitan Police Department.
19   Q.   What's your current rank?
20   A.   PFC, patrolman first class.
21   Q.   I'm sorry, I cut you off.
22   A.   Patrolman first class.
23   Q.   How long have you been with the Metropolitan
24   Police Department?
25   A.   About seven and a half years.

1   proceed.

2          BY MR. HARAY::

3     Q.   Do you know someone named Jonathan Rude?

4     A.   I do.

5     Q.   How do you know him?

6     A.   He was a bouncer or security at that establishment

7   also.

8     Q.   When did Jonathan Rude work at Tony & Joe's?

9     A.   Mostly the summer of 2003. And I believe he

10  worked some 2004.

11     Q.   What kind of relationship do you have with

12  Mr. Rude?

13     A.   Just from seeing him at that establishment.

14     Q.   How about the defendant, what kind of relationship

15  do you have with him?

16     A.   Same.

17     Q.   Who else were you working with on June 27, 2004?

18     A.   Officer Luckett was working with me.

19     Q.   What was Officer Luckett doing?

20     A.   Same thing as me.

21     MR. HARAY:  Shall I continue, Your Honor?

22     THE COURT:  Got about a minute. You may continue

23  for the minute.

24          BY MR. HARAY::

25     Q.   Officer Owen, at some point on June 27, 2004, did

1  it come to your attention that there was a problem?
2        MR. WILLIAMSON: Objection, Your Honor. Leading.
3        THE COURT: Sustained.
4        BY MR. HARAY::
5   Q.  What happened on June 27, 2004?
6   A.  Right around the closing time when all the bars
7   close, another bouncer that worked at the bar Tony & Joe's
8   by the name of Tony Wood approached Officer Luckett and
9   myself and he asked us very politely if we would turn our
10  backs and allow two bouncers to fight one on one.
11       MR. WILLIAMSON: Objection, Your Honor. Hearsay.
12       THE COURT: We're going to pick up with that. I'm
13  going to give the jury a lunch recess at this time.
14       Ladies and gentlemen, it's my intention to start
15  at 2:30. I'm going to ask you not to discuss this case in
16  any way, shape or form. Thank you very much for your
17  attention. I'll see you at 2:30.
18       Counsel, you may approach.
19       Sir, I'll see you at 2:15.
20       (Jury excused at 12:59 p.m.)
21       THE COURT: Just wait for the jury.
22       THE WITNESS: Yes, sir.
23       (Witness excused.)
24            (BENCH CONFERENCE.)
25       THE COURT: All right.

1   bench.  You may continue with your examination.
2              DIRECT EXAMINATION (Resumed)
3        BY MR. HARAY::
4        Q.  Officer Owen, what happened when Tony Wood
5   approached you and Officer Luckett?
6        A.  He had asked us politely if we would turn our
7   backs to allow the bouncers to fight one on one.
8        Q.  Where were you when he said that?
9        A.  We were in the middle of the harbor, in between
10  Riverside and Tony & Joe's Restaurant by the fountain.
11       Q.  Showing you Exhibit Number 1.  Can you just put an
12  "X" with this marker where you were when that happened?
13       A.  This is Riverside Grill on this side.  This is
14  Tony & Joe's on this side.  We were right in the middle?
15            THE COURT:  Keep your voice up, sir.
16            THE WITNESS:  Right in the middle.
17            BY MR. HARAY::
18       Q.  Where the "X" is?
19       A.  Where the "X" is, in the middle of the two
20  restaurants.
21       Q.  How did you respond to his question?
22       A.  We told him no, we were not going to allow that.
23       Q.  What did you do next?
24       A.  We walked into Tony & Joe's Restaurant where I saw
25  Jon Rude inside the -- this was around closing time, so

1  there weren't a lot of patrons in the bar. It was rather
2  empty.
3      Q.  Where was Mr. Rude?
4      A.  He was inside of the restaurant of Tony & Joe's.
5      Q.  Do you know specifically where he was inside?
6      A.  I believe he was right by the bar area inside of
7  the restaurant.
8      Q.  Who was he with?
9      A.  I believe he was with two of his friends.
10     Q.  Did you know those people?
11     A.  No, I did not.
12     Q.  What happened?
13     A.  Jon Rude appeared to be very nervous. We asked
14 him what was going on. He claimed he did not know why Yinka
15 wanted to fight him. And he also furthermore claimed that
16 he did not want to fight Yinka.
17     Q.  What did you do then?
18     A.  Officer Luckett had gone back outside, because
19 Yinka was outside rather angry. He had one of his fist
20 balled up and punching his hand like so.
21     Q.  You're demonstrating by punching your left hand
22 into your open right palm; is that right?
23     A.  Yes.
24     Q.  Now, where were you when you saw the defendant
25 making that motion?

1    A.    We were inside next to Jon Rude.

2    Q.    And where was the defendant when he was doing
3 that?

4    A.    Outside of Tony & Joe's restaurant.

5         THE COURT: Excuse me. You had your left hand
6 hitting your right hand. Are you describing which hand he
7 hit?

8         THE WITNESS: I don't remember which hand he was
9 hitting. But that was the motion that he was -- he was very
10 angry. He was like pumping himself up and punching one fist
11 into to the palm of a hand.

12        THE COURT: Are you left handed or right handed?

13        THE WITNESS: I'm left handed, sir.

14        BY MR. HARAY::

15   Q.    Do you recall which fist he was using and which
16 palm was open?

17   A.    No, I do not.

18   Q.    How could you see him?

19   A.    Through the glass.

20   Q.    What did you do next?

21   A.    Officer Luckett had gone outside to where Yinka
22 was. The idea was to keep them separated. And I walked Jon
23 Rude and two of his friends out the side door of the Tony &
24 Joe's along with a third party that was with Mr. Rude.

25   Q.    Who was at the side door?

1  A.  Who was at the --

2  Q.  Was anyone standing at the side door?

3  A.  No one was standing at the side door.

4  Q.  Where were you headed?

5  A.  The idea was to walk Jon out the side door to get
6  him to his vehicle so he could leave safely.

7  Q.  When you left Tony & Joe's, did you know where
8  Mr. Rude's car was?

9  A.  Not at the time.

10 Q.  What happened after you left the bar?

11 A.  We walked out the side. And we were walking along
12 the boardwalk eastbound in an eastbound direction toward, I
13 believe it's 30th Street. And I was with Mr. Rude, his two
14 friends and an employee of the bar.

15      And as we were walking, I turned around and
16 observed Yinka and his brother Tolson walking behind us.

17 Q.  Now I -- I forgot my marker. Excuse me.

18      Now, why don't you look at Exhibit Number 1 and
19 point out to us where you were when you saw the defendant
20 behind you?

21 A.  This would be the side entrance right here right
22 next to where this S shape is. We had walked out this way
23 and this is the boardwalk here. And this is, I believe it's
24 30th Street right here.

25 Q.  You're indicating that the boardwalk is the part

316

1   that runs along the river?

2       A.   Yes.  Right along the river here.

3            We came out the side door.  And this is where the
4   defendant Yinka was, where this "X" is, the outside
5   entrance.  The idea was to take him out the side entrance to
6   where he possibly couldn't see us walk out, to keep them
7   separated.

8            As we were walking out onto the boardwalk here
9   towards 30th Street, I turned around and observed the
10  defendant approaching from behind along with his brother.

11      Q.   Do you know where you were on the boardwalk when
12  you turned around and saw him?

13      A.   We were probably maybe around here somewhere,
14  maybe a little bit further back.  And the defendant was
15  walking up from, from around here.

16      Q.   Okay.  Now, why don't you put a triangle where you
17  saw the defendant?

18      A.   I believe he was right around here.

19      Q.   And just put a, put an "R" for where you and
20  Mr. Rude stopped and where you turned around?

21      A.   I believe we were right here.

22      Q.   Thank you.  What did you see next?

23      A.   I had observed, like I said, the defendant walking
24  up behind us.  It was at that time that I had my full
25  uniform on along with my duty belt.  I thought there may be

317

1   trouble me being by myself along with Mr. Rude and his three
2   parties he was with and Yinka and his brother.
3          I pulled out my pepper spray that we have on our
4   belt, which was standard. And I put it down to my side just
5   in case there was trouble very quickly before I could get
6   any assistance.
7          I then yelled at Yinka and his brother to return
8   back to the bar. Yinka then became very enraged at that
9   time. He started banging on tables, tossing tables over.
10  He was extremely angry.
11     Q.   How many tables did he turn over?
12     A.   I don't recall.
13     Q.   How many times did he bang on tables?
14     A.   I don't recall.
15     Q.   Was he saying anything to you while he was doing
16  that?
17     A.   I don't recall exactly what he was saying off the
18  top of my head. But he was extremely furious.
19     Q.   Who's his brother?
20     A.   Tolson.
21     Q.   What was Tolson doing while the defendant was
22  doing that?
23     A.   To my knowledge, I don't think he was really doing
24  anything. I think he was just with him.
25     Q.   What did you do?

1    A.   Like I said, I ordered them back to the bar.  And
2 after Yinka banged on a couple of tables and turned a couple
3 over, he eventually went back to the bar.
4    Q.   What kind of tables are you talking about?
5    A.   These are plastic outdoor tables and chairs that
6 you find at any normal outdoor restaurant.
7    Q.   Where did he go then?
8         THE COURT:  The tables were outside of the
9 restaurant?
10        THE WITNESS:  Tony & Joe's is right on the water,
11 so they had outdoor dining and indoor dining in the summer.
12 It's a rather popular restaurant during the summer time.
13        THE COURT:  So the tables where outside that you
14 said he turned over?
15        THE WITNESS:  Yes, sir.
16        THE COURT:  They were outside, not inside the
17 restaurant?
18        THE WITNESS:  No, no.  They've formal dining
19 inside, and they have like plastic --
20        THE COURT:  Plastic tables outside?
21        THE WITNESS:  Yes, like lightweight.
22        THE COURT:  Next question, counsel.
23        BY MR. HARAY::
24   Q.   Where did the defendant go from there?
25   A.   He went back toward the entrance to the restaurant

```
 1              BY MR. WILLIAMSON::
 2        Q.    You all were walking down the boardwalk; right?
 3        A.    Correct.
 4        Q.    You testified that you all were going to the east;
 5   is that correct?
 6        A.    Going eastbound toward 30th Street.
 7        Q.    On the boardwalk?
 8        A.    Correct.
 9        Q.    You testified that you had observed Mr. Adeboyeku
10   and his brother; right?
11        A.    Correct.
12        Q.    And that they were walking behind you all?
13        A.    Correct.
14        Q.    How far behind you and the four gentlemen was
15   Mr. Adeboyeku and his brother?
16        A.    I don't remember exactly how far behind us they
17   were.  They were walking in the same direction as us, behind
18   us.  They were -- I don't know how many feet they were
19   behind us.  But they were a good distance away.  Yet you
20   could still see exactly who they were and I could yell for
21   them to turn around and they heard me.
22        Q.    And you told Mr. Adeboyeku to go back into the
23   restaurant; right?
24        A.    Correct.
25        Q.    Because you thought he was extremely angry; right?
```

324

1    A.    Yes. I knew he was angry. But when I told him to
2    go back to the bar he became enraged. He became very angry.
3    Q.    You testified that he was banging on tables;
4    correct?
5    A.    Yes.
6    Q.    These tables where outside of the restaurant?
7    A.    Yes.
8    Q.    And that he was knocking over tables; is that
9    correct?
10   A.    Correct.
11   Q.    But he eventually turned around?
12   A.    Yes.
13   Q.    And went back into the restaurant?
14   A.    So I assumed. He want back towards that direction
15   to go back into the restaurant.
16   Q.    You actually had started walking back towards the
17   restaurant yourself; is that right?
18   A.    After I walked Rude down to 30th Street and then
19   up towards K Street, I continued walking with them for a
20   couple more minutes.
21   Q.    At some point you turned around and walked back
22   toward the restaurant; is that correct?
23   A.    Correct.
24   Q.    And the reason why you all, the reason why you
25   were walking with them to begin with was for their safety;

1     A.  Yeah.

2     Q.  Okay.  And this was due to what Tony Wood had said
3  to you at Tony & Joe's; right?

4     A.  That the two guys wanted to fight?

5     Q.  Right.

6     A.  I guess.

7     Q.  Okay.  Well, yes or no?

8     A.  I don't understand where you are going with the
9  question.

10    Q.  Your concern for their safety, it was due to what
11 Tony Wood had said to you?

12    A.  I don't want to see anybody get hurt, counsel.  I
13 mean, I am concerned for anybody who potentially could get
14 into a fight.  I am concerned for their safety.

15    Q.  So then, you were concerned because of what he had
16 said to you; right?

17    A.  Mr. Wood?

18    Q.  That's correct.

19    A.  Yes.

20    Q.  You were concerned because --

21    THE COURT:  Let him finish the question.

22    Was that the reason you were concerned?

23    THE WITNESS:  I was going to add, furthermore, the
24 defendant's actions, how he was behaving and that Mr. Rude
25 not wanting to fight, I was concerned for his safety, yeah.

335